# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0552-17T4

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

ERIC KIM,

      Defendant-Appellant.

_____

Submitted February 5, 2019 – Decided April 9, 2019

Before Judges Gilson and Natali.

On appeal from Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 16-06-0755.

Wronko Loewen Benucci, attorneys for appellant (Gilbert G. Miller, on the briefs).

Dennis Calo, Acting Bergen County Prosecutor, attorney for respondent (William P. Miller, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel; Catherine A. Foddai, Legal Assistant, on the brief).

PER CURIAM

Defendant Eric Kim was indicted for crimes related to a robbery and sexual assault. The jury convicted defendant of second-degree robbery, N.J.S.A. 2C:15-1(a)(1); fourth-degree criminal sexual contact, N.J.S.A. 2C:14-3(b), as a lesser-included offense of second-degree sexual assault; and disorderly persons simple assault, N.J.S.A. 2C:12-1(a)(1), as a lesser-included offense of third-degree aggravated assault. Defendant was found not guilty of first-degree sexual assault during a robbery, N.J.S.A. 2C:14-2(a)(3).

On the robbery conviction, defendant was sentenced to an extended term of thirteen years in prison with parole ineligibility and supervision as prescribed by the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. He was also sentenced to a concurrent term of eighteen months in prison for the fourth-degree conviction and a consecutive term of four months of incarceration for the disorderly persons conviction. Defendant appeals his convictions and sentence. We affirm.

I.

The evidence at trial established that on April 17, 2016, E.R. (Erica) was robbed and V.A.E. (Val), who came to help Erica, was assaulted. Erica, Val,

and Erica's boyfriend, S.E. (Sam), all testified at trial.[1] Val is Sam's brother.

Erica testified that on April 17, 2016, she went to Sam's apartment. Sam was a disc jockey and earlier that day he had worked at a party. The apartment building where Sam lived had a foyer between the outside door and a locked interior glass door. Behind the glass door, there was a straight corridor that turned at the end of the hall and led to the stairs for the upper floors. Sam's apartment was on the sixth floor. The apartment building had several video surveillance cameras, which recorded the area outside the front door, inside the foyer, and in the corridor leading from the interior door to the turn towards the stairs. No camera was positioned to record the area beyond where the corridor turned and led to the stairs.

When Erica arrived at Sam's apartment building, she called Sam on her cell phone. Sam told her that he and Val were in the process of carrying some of his equipment upstairs and he would come down to let her into the building when they finished.

Initially, Erica waited for Sam outside the apartment building. Several minutes later, however, another resident entered the building, unlocked the

---

[1] We use initials and fictitious names to protect the privacy interests of the victims and witnesses.

A-0552-17T4

interior glass door and allowed Erica to enter the corridor. While Erica was standing in the corridor, defendant, who had entered the foyer after Erica, knocked on the interior glass door. Thinking that defendant was another resident of the building, Erica opened the door and let defendant inside the corridor. Erica then began walking down the corridor with defendant behind her.

Erica testified that after she turned into the corridor that led to the stairs, defendant came up behind her, pulled up her skirt, and touched her legs. Erica tried to push defendant away, they struggled, and during that struggle, defendant put his hand inside Erica's underwear and touched her vagina. Erica then began to yell for help.

Sam and Val testified that they were on the second floor carrying a speaker up to their apartment when they heard Erica screaming. Sam ran downstairs and saw Erica on the floor with defendant on top of her. He also saw defendant's hand between Erica's legs. Sam pulled defendant off Erica and a struggle ensued during which defendant tried to leave, but Sam tried to restrain him. While Sam and defendant were struggling, Val came and helped Sam. Val and Sam tried to restrain defendant and during that struggle defendant bit Val on his shoulder. Eventually, Sam and Val were able to subdue defendant and restrain him from leaving.

4

A resident of the building called 911, and two police officers responded to the scene. One of officers testified at trial that when he arrived, he saw Sam and Val sitting on top of defendant. Defendant was then arrested, and both officers testified that defendant repeatedly told them, "I did it, I did it."

Later that evening, Erica and Val, who both spoke Spanish, gave statements to the police. Erica was then taken to a hospital where she was examined by a forensic nurse.

Meanwhile, defendant was taken to the police station, interviewed by two detectives, and that interview was video recorded. At the beginning of the interview, defendant was given and waived his Miranda[2] rights. He was then questioned, and, during that questioning, defendant admitted that he had intended to rob Erica. Defendant repeatedly denied sexually assaulting Erica. One of the detectives then told defendant some misstatements concerning the law. Specifically, the detective informed defendant that he would not be subject to Megan's Law, N.J.S.A. 2C:7-1 to -23, if he confessed to touching Erica's vagina with one finger for a short duration. Thereafter, defendant stated that he could not recall penetrating Erica's vagina, but to give her piece of mind, the

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

A-0552-17T4

detective could tell her that "it was the index finger and nothing happened to it."[3]

In June 2016, a grand jury indicted defendant for four crimes: (1) first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(3); (2) second-degree sexual assault, N.J.S.A. 2C:14-2(c)(1); (3) second-degree robbery, N.J.S.A. 2C:15-1(a); and (4) third-degree aggravated assault of Val, N.J.S.A. 2C:12-1(b)(7).

Before trial, defendant moved to suppress his statement to the detectives. The trial court conducted an evidentiary hearing, during which the court heard testimony from the lead detective who had questioned defendant. The court also reviewed the recording of defendant's interview. After hearing that evidence, the court initially granted the motion to suppress finding that the lead detective had misled defendant by giving him false statements concerning the law. On reconsideration, however, the court ruled that the initial portion of defendant's

---

[3] We note that this quote comes from the trial court's February 3, 2017 decision on the motion to suppress. The record on appeal did not include the video recording or the full transcript of defendant's statement. Instead, the record includes only the first twelve pages of defendant's statement and a transcript of the video recording played at the motion to suppress, wherein portions of defendant's statements were deemed "indiscernible." Nevertheless, neither party disputes the quote in the trial court decision and both parties acknowledge in their briefs that defendant eventually admitted to digitally penetrating Erica after the detective incorrectly advised him on the applicability of Megan's Law.

statement could be introduced at trial because the inaccurate statements concerning the law were only made after defendant had already admitted that he intended to rob Erica. The court also ruled that it was suppressing the second portion of defendant's statement because of the detective's misleading statements of the law, combined with what the court perceived to be overbearing attempts by the detective to get defendant to confess to the alleged sexual assault despite his continued denials.

A jury trial was conducted in March and April 2017. At trial, the State introduced and played the initial portion of defendant's statement, during which he admitted that he intended to rob Erica.

The State also introduced and showed the jury video footage captured by the surveillance cameras at Sam's apartment building. Testimony describing the surveillance footage explained that one of the video clips showed Erica in the corridor just beyond the glass interior door arranging her hair. Shortly thereafter, the clip showed defendant approach the glass door, knock on it, and then Erica opened it for him. Erica can be seen walking down the corridor with defendant following her, and then Erica turned into the hallway leading to the stairs. The jury also watched a clip showing Sam and defendant near the glass interior door. Sam grabbed defendant and pulled him to the floor. Defendant

struggled to his feet, and tried to open the door. Val then arrived and he and Sam struggled with defendant. In addition, the jury viewed a photograph of Val's shoulder taken by a police officer on the night of the incident, which showed an area of noticeably discolored skin "a little bit larger than a quarter."

After all the evidence was presented, counsel made their closing arguments. During her closing arguments, the assistant prosecutor discussed criminal attempt and discussed how "shaken up," "embarrassed," and "exhausted" Erica was as a result of what defendant did to her. Defense counsel made no objections to those comments.

The trial court then instructed the jury. As part of those instructions, the court explained criminal attempt to the jury in connection with the charges of aggravated sexual assault and aggravated assault. The court did not instruct the jury on attempt as part of its charge concerning robbery. Defense counsel did not object and did not request the court to charge the jury on attempt in connection with the robbery charge.

As explained earlier, based on the evidence at trial, the jury convicted defendant of second-degree robbery, fourth-degree criminal sexual contact, and disorderly persons simple assault of Val.

Defendant applied for a sentence to special probation in drug court. The prosecutor, however, rejected his application. Thereafter, defendant appealed that rejection to the Law Division. After hearing argument, the Law Division denied defendant's motion, finding that he was not eligible for drug court because he had a prior conviction for aggravated assault.

Thereafter, in August 2017, defendant was sentenced. His aggregate sentence was for thirteen years and four months in prison. In accordance with NERA, he is ineligible for parole for eighty-five percent of the thirteen years, and when released, he is subject to three years of parole supervision.

II.

Defendant now appeals his convictions and sentence. He makes six arguments, which he articulates as follows:

> POINT I – THE TRIAL COURT'S DENIAL OF DEFENDANT'S APPEAL FROM HIS DRUG COURT EXCLUSION WAS ERRONEOUS.
>
> POINT II – THE SURVEILLANCE VIDEO FOOTAGE WAS NOT PROPERLY AUTHENTICATED AND LACKED FOUNDATION AND THUS SHOULD NOT HAVE BEEN ADMITTED.
>
> POINT III – THE TRIAL COURT'S RECONSIDERATION OF ITS INITIAL SUPPRESSION RULING THAT DEFENDANT'S STATEMENT TO THE POLICE WAS

INVOLUNTARY AND INADMISSIBLE AND CONSEQUENT DECISION TO ADMIT A PORTION OF DEFENDANT'S STATEMENT WAS ERRONEOUS.

POINT IV – THE COURT'S FINAL JURY INSTRUCTIONS WERE ERRONEOUS IN FAILING TO INSTRUCT THE JURY ON THE ELEMENTS OF AN ATTEMPT TO COMMIT THEFT WHICH COULD SUPPORT THE ROBBERY CHARGE.

POINT V – THE PROSECUTOR ENGAGED IN MISCONDUCT ON SUMMATION WHICH CUMULATIVELY DEPRIVED DEFENDANT OF A FAIR TRIAL AND REQUIRES THE REVERSAL OF DEFENDANT'S CONVICTIONS.

POINT VI – DEFENDANT'S SENTENCE IS MANIFESTLY EXCESSIVE.

We are not persuaded by any of defendant's arguments and we discern no grounds for reversing the jury convictions or his sentence. We will address defendant's arguments in the procedural order in which they arose.

A.    Defendant's Statements to Law Enforcement Officers

Defendant challenges the trial court's decision to admit into evidence the first portion of his statement to the detectives. He argues that because one of the detectives made misstatements concerning the law and repeatedly tried to get him to confess to the alleged sexual assault, the entire statement was effectively involuntary. Thus, he contends that because the State played a

portion of that statement before the jury, his conviction should be reversed under concepts of due process and fundamental fairness.

"The right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503." State v. S.S., 229 N.J. 360, 381-82 (2017) (quoting State v. Nyhammer, 197 N.J. 383, 399 (2009)). In determining whether a defendant's incriminating statement is inadmissible, "the State must 'prove beyond a reasonable doubt that the suspect's waiver [of rights] was knowing, intelligent, and voluntary[.]'" State v. A.M., 452 N.J. Super. 587, 596 (App. Div. 2018) (alterations in original) (quoting State v. Yohnnson, 204 N.J. 43, 59 (2010)).

A court evaluates whether the State has satisfied its burden by considering the "totality of the circumstances[.]" Ibid. (alteration in original) (quoting Nyhammer, 197 N.J. at 402). Under the totality-of-the-circumstances analysis, a court considers factors such as the defendant's "age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved." Ibid. (quoting Nyhammer, 197 N.J. at 402).

When we review a trial court's decision on a motion to suppress a statement, we generally defer to the factual findings of the motion court when they are supported by credible evidence in the record. State v. Vincenty, ___ N.J. ___, ___ (2019) (slip op. at 11) (quoting State v. Hubbard, 222 N.J. 249, 262 (2015)). Deference to a trial court's factual findings is appropriate "because the trial court has the 'opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy." S.S., 229 N.J. at 374 (quoting State v. Elders, 192 N.J. 224, 244 (2007)). Deference is required even if the trial court's factual findings "are based solely on its review of a video recording." Id. at 386. We review de novo the trial court's legal conclusions that flow from established facts. State v. Hamlett, 449 N.J. Super. 159, 169 (App. Div. 2017) (citing Hubbard, 222 N.J. at 263).

Here, the trial court found that defendant had received appropriate Miranda warnings, and had knowingly, voluntarily, and intelligently waived his rights and agreed to speak with the detectives. The court's findings in that regard were supported by substantial credible evidence in the record. The court then concluded that, for the initial portion of the interview, defendant freely and voluntarily spoke with the detectives. After making an admission concerning his intent to rob Erica, however, the court found that the detective made

misstatements of law related to the alleged sexual assault. The court further found that the detective acted in an overbearing manner by repeatedly attempting to garner a confession from defendant despite his continued denials. Accordingly, the court found that after defendant was told misstatements of the law, his further statements were not voluntary and knowing and, therefore, were not admissible.

The trial court's findings in that regard are supported by substantial credible evidence in the record. The transcript of defendant's statements to the detectives demonstrates that he was given his Miranda warnings, waived his rights, and freely and voluntarily answered certain questions. Accordingly, that initial portion of defendant's statement was admissible.[4]

Defendant cites no case law to support his position that an entire interview needs to be suppressed if, part way through the interview, law enforcement officers make a misstatement of the law. Instead, defendant cites to case law addressing suppression of statements given when there is an initial violation of an individual's right against self-incrimination. Those cases are distinguishable

---

[4] As mentioned previously, the record on appeal includes only the first twelve pages of the transcript of defendant's statement, as well as a transcript of the video recording played at the motion to suppress. We were not provided with the video of defendant's statement.

from this situation. Here, the complained-of conduct, that is, the misstatement of law and continued questioning, occurred after defendant had confessed to attempted robbery. Consequently, defendant's statements as to the intent to rob Erica were voluntarily and intelligently given and are admissible.

B.   The Surveillance Video Footage

Defendant also challenges the court's admission of video footage from the surveillance cameras at Sam's apartment building. Defendant contends that the State did not properly authenticate the videos because there was no testimony describing where the cameras were located and how the video footage was recorded.

To be admissible, video footage must be authenticated by evidence sufficient to show that the video is what it purports to be. See N.J.R.E. 901. "Authentication 'does not require absolute certainty or conclusive proof[.]'" State v. Hannah, 448 N.J. Super. 78, 89 (App. Div. 2016) (quoting State v. Tormasi, 443 N.J. Super. 146, 155 (App. Div. 2015)). Instead, "only 'a prima facie showing of authenticity' is required." Ibid. (quoting Tormasi, 443 N.J. Super. at 155). "To that end, any person with the requisite knowledge of the facts represented in the photograph or videotape may authenticate it." State v.

14

Wilson, 135 N.J. 4, 14 (1994); accord State v. Hockett, 443 N.J. Super. 605, 613 (App. Div. 2016).

Generally, authentication of video footage requires testimony from an individual who was present at the time of the events and who states that the video "accurately depict[s] the events as that person saw them when they occurred." Wilson, 135 N.J. at 17 (citing Balian v. Gen. Motors, 121 N.J. Super. 118, 125 (App. Div. 1972)). Consequently, any witness with sufficient personal knowledge "can verify that the [video] accurately represents its subject." Id. at 14.

The decision on whether to admit video footage is an evidentiary question. Trial courts' "evidentiary rulings are 'entitled to deference absent a showing of an abuse of discretion, [that is], there has been a clear error of judgment.'" State v. Brown, 170 N.J. 138, 147 (2001) (quoting State v. Marrero, 148 N.J. 469, 484 (1997)). We will, therefore, not substitute our own judgment for that of the trial court, "unless 'the trial court's ruling "was so wide of the mark that a manifest denial of justice resulted."'" Ibid. (quoting Marrero, 148 N.J. at 484); accord State v. Prall, 231 N.J. 567, 580 (2018).

Here, we discern no abuse of discretion in the trial court's admission of the video footage. The court conducted a Rule 104 hearing, and at that hearing,

Erica identified the locations represented in the videos based on her personal knowledge of the apartment building. She also identified herself and other people whom she knew as they appeared in the video footage. Erica also testified that the information portrayed in the videos accurately reflected the events that occurred on April 17, 2016. Consequently, she appropriately authenticated the video footage.

C.    The Prosecutor's Comments

Defendant argues that the prosecutor engaged in misconduct by making certain comments during closing arguments. In that regard, defendant challenges the prosecutor's definition of criminal attempt and argues that the prosecutor impermissibly appealed to the jury's sentiment by engaging in a lengthy discussion of the hardships suffered by Erica.

It is well settled that prosecutors are afforded wide latitude during summation. State v. R.B., 183 N.J. 308, 330 (2005) (quoting State v. Mayberry, 52 N.J. 413, 437 (1968)). Prosecutors generally "must confine their comments to evidence revealed during the trial and reasonable inferences to be drawn from that evidence." State v. Smith, 167 N.J. 158, 178 (2001) (first citing State v. Frost, 158 N.J. 76, 85 (1999); then citing State v. Marks, 201 N.J. Super. 514, 534 (App. Div. 1985)). In evaluating a claim of prosecutorial misconduct, there

A-0552-17T4

are two issues to be addressed: (1) whether the prosecutor's comments amounted to misconduct and, if so, (2) whether the prosecutor's conduct justifies reversal. State v. Wakefield, 190 N.J. 397, 446 (2007) (quoting Smith, 167 N.J. at 181). Reversal of a defendant's conviction is not justified unless the prosecutor's comments were "so egregious that [they] deprived the defendant of a fair trial." Id. at 438 (quoting Smith, 167 N.J. at 181).

Generally, if no objection was made to the prosecutor's remarks, the remarks will not be deemed prejudicial. State v. Kane, 449 N.J. Super. 119, 141 (App. Div. 2017) (quoting Frost, 158 N.J. at 83). "The failure to object suggests that defense counsel did not believe the remarks were prejudicial at the time they were made." Frost, 158 N.J. at 84. "The failure to object also deprives the court of an opportunity to take curative action." Ibid. (citing State v. Bauman, 298 N.J. Super. 176, 207 (App. Div. 1997)).

Here, defense counsel made no objection to either of the prosecutor's comments. On appeal, however, defendant challenges the prosecutor's statement that "[t]here is nothing in the law of robbery that says something has to be taken at all. What matters is that you intended to take something, and that you exercised steps of force in that process." The prosecutor went on to state that "under the law of robbery it has to be an intent to take something, not an

17

actual taking, and there needs to be force overpowering." Defendant argues that those statements constitute misconduct because they had a clear capacity to mislead the jury as to the law on criminal attempt.

The trial court, however, gave the jury clear instructions on the requirements of criminal attempt during its charge. Moreover, the court explicitly instructed the jury that "any statements by the attorneys to what the law may be must be disregarded . . . if they are in conflict with my charge." Given the court's instructions and the presumption that a jury will adhere to the court's instruction, we discern no misconduct by the prosecutor sufficient to prejudice defendant or require the reversal of a jury conviction. See State v. Burns, 192 N.J. 312, 335 (2007); State v. Loftin, 146 N.J. 295, 390 (1996); State v. Herbert, ___ N.J. Super. ___, ___ (App. Div. 2019) (slip op. at 16).

Defendant also claims that the prosecutor improperly discussed hardships Erica suffered due to the incident. The prosecutor's statements, however, were based on the admitted testimony provided by Erica, Sam, and the forensic nurse who conducted the sexual assault examination of Erica. Accordingly, we discern no misconduct in the prosecutor's discussion of the hardships suffered by Erica.

A-0552-17T4

D.    The Jury Instructions

Next, we analyze the jury instructions.  Defendant argues that his robbery conviction should be reversed because the jury charge on robbery did not include a definition of criminal attempt.  Defendant did not object to the jury instruction at trial, nor did he offer an alternative instruction on the robbery charge. Accordingly, we review this issue for plain error.  R. 2:10-2.

"To warrant reversal [under the plain error standard], the error must be 'clearly capable of producing an unjust result.'"  State v. McKinney, 223 N.J. 475, 494 (2015) (quoting R. 2:10-2).  Our Supreme Court has explained that

> [i]n the context of jury instructions, plain error is "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result."
>
> [Ibid. (alterations in original) (quoting State v. Camacho, 218 N.J. 533, 554 (2014)).]

Furthermore, in reviewing jury instructions, we must consider the challenged portions of the instructions in context of the entire charge to determine whether the overall effect was misleading or ambiguous.  Ibid. (first quoting State v. Jordan, 147 N.J. 409, 422 (1997); then quoting State v. Nelson, 173 N.J. 417, 447 (2002)).  In situations where a trial court correctly instructs

19                                                            A-0552-17T4

the jury concerning certain components of the charge, "[t]he test to be applied . . . is whether the charge as a whole is misleading, or sets forth accurately and fairly the controlling principles of law." Id. at 496 (alterations in original) (quoting State v. Jackmon, 305 N.J. Super. 274, 299 (App. Div. 1997)). Thus, "[t]he key to finding harmless error in such cases is the isolated nature of the transgression and the fact that a correct definition of the law on the same charge is found elsewhere in the court's instructions." Ibid. (quoting Jackmon, 305 N.J. Super. at 299-300). See State v. Smith, 322 N.J. Super. 385, 398-400 (App. Div. 1999) (holding that the failure to define attempt in charging the jury on robbery did not prejudice defendant's rights because criminal attempt was defined for the jury in the instruction on the law on another charge).

Here, considering the charge in its entirety, we find no reversible error. In charging the jury, the trial court defined criminal attempt on two occasions. First, criminal attempt was defined when the jury was instructed on aggravated sexual assault. The court also defined criminal attempt in giving the instructions concerning aggravated assault. Those instructions accurately defined criminal attempt. Accordingly, we discern no plain error in the court not defining criminal attempt in connection with the robbery charge. Moreover, we note that

A-0552-17T4

there was strong evidence of defendant's attempt to rob Erica, which included Erica's testimony, defendant's admissions, and the video footage.

E.    Drug Court

Defendant also challenges the denial of his entry into drug court. He contends that the trial court erred when it held that he was ineligible for drug court based on his 2011 conviction for a third-degree aggravated assault.

"Drug Courts are specialized courts within the Superior Court that target drug-involved 'offenders who are most likely to benefit from treatment and do not pose a risk to public safety.'" State v. Meyer, 192 N.J. 421, 428-29 (2007) (citing Administrative Office of the Courts, Manual for Operations of Adult Drug Courts in New Jersey (Drug Court Manual) (July 2002), https://www.njcourts.gov/courts/assets/criminal/dctman.pdf). There are two tracks for admission to drug court. Meyer, 192 N.J. at 431 (citing Drug Court Manual 10). Offenders must either satisfy the requirements for "special probation" pursuant to N.J.S.A. 2C:35-14 (Track One), or "otherwise be eligible under other sections of the Code of Criminal Justice" (Track Two). Drug Court Manual 10; accord State v. Maurer, 438 N.J. Super. 402, 413 (App. Div. 2014) (quoting State v. Clarke, 203 N.J. 166, 174-76 (2010)).

Determining whether an offender is eligible for drug court involves questions of law. Maurer, 438 N.J. Super. at 411. Accordingly, we use a de novo standard of review. Ibid.

Here, we agree with the trial court that defendant was not eligible for drug court. Defendant's 2011 conviction for third-degree aggravated assault made him ineligible for drug court under Track One. N.J.S.A. 2C:35-14(a)(7) sets forth one of the nine statutory requirements a Track One applicant must satisfy for special probation eligibility. That statutory provision precludes persons previously convicted of certain crimes, including "aggravated assault," from Track One admission. See N.J.S.A. 2C:35-14(a)(7).

Defendant, nonetheless, argues that the exclusion under N.J.S.A. 2C:35-14(a)(7) should be interpreted to apply only to first- or second-degree aggravated assaults. We reject that position as inconsistent with the plain language of the statute. See State v. Fede, ___ N.J. ___, ___ (2019) (slip op. at 11) ("If the plain language of a statute is clear, that ends the matter; we then are duty-bound to apply that plain meaning." (citing Kean Fed'n of Teachers v. Morell, 233 N.J. 566, 584 (2018)). The statute does not limit the disqualifying convictions to those who have first- or second-degree convictions. Instead, the

statute uses the term "aggravated assault" without any indication of a limitation to a conviction for a first- or second-degree charge.  N.J.S.A. 2C:35-14(a)(7).

Defendant is also ineligible for admission to drug court under Track Two. The applicable statutes and the Drug Court Manual preclude offenders who are subject to a presumption of incarceration from admission to drug court under Track Two.  See N.J.S.A. 2C:35-14(a); N.J.S.A. 2C:44-1(d); Drug Court Manual 10, 16.  Track Two is designed for "[s]ubstance abusing nonviolent offenders[,]" Drug Court Manual 16, who are not facing "a presumption of incarceration or a mandatory minimum period of parole ineligibility[.]"  N.J.S.A. 2C:35-14(a).

Here, defendant was convicted of second-degree robbery, which carries both a presumption of incarceration and a mandatory period of parole ineligibility under NERA.  See N.J.S.A. 2C:43-7.2; N.J.S.A. 2C:44-1(d).  In that regard, we reject defendant's argument that we should interpret the Drug Court Manual to permit a second-degree offender to be considered under Track Two.

F.    The Sentence

Finally, defendant contends that his thirteen-year extended-term sentence to prison, with a period of parole ineligibility as prescribed by NERA, was manifestly excessive and should be reversed.  We disagree.

23                                      A-0552-17T4

We review sentencing decisions for a "clear showing of abuse of discretion." State v. Bolvito, 217 N.J. 221, 228 (2014) (quoting State v. Whitaker, 79 N.J. 503, 512 (1979)). We will affirm a trial court's sentence unless: "(1) the sentencing guidelines were violated; (2) the findings of aggravating and mitigating factors were not 'based upon competent credible evidence in the record;' or (3) 'the application of the guidelines to the facts' of the case 'shock[s] the judicial conscience.'" Ibid. (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

Under the persistent offender statute, N.J.S.A. 2C:44-3(a), a sentencing court has discretion "to impose an extended sentence when the statutory prerequisites for an extended-term sentence are present." State v. Pierce, 188 N.J. 155, 161 (2006). A defendant is statutorily eligible for an extended term under N.J.S.A. 2C:44-3 if he or she "has been convicted of a crime of the first, second or third degree and is a persistent offender." N.J.S.A. 2C:44-3(a). A person is a "persistent offender" if he or she is age twenty-one or older at the time of the offense and has been previously convicted on at least two separate occasions of two crimes when he or she was at least eighteen years old. Ibid. The latest crime, or the defendant's latest release from confinement, must also

be within ten years of the date of the crime for which the defendant is being sentenced. Ibid.

Here, defendant does not dispute that he qualified for an extended term. Defendant had been convicted of a second-degree robbery and he had two prior convictions of burglary and aggravated assault, which happened on separate occasions when he was over the age of eighteen. Moreover, his most recent conviction for aggravated assault was in 2011, which occurred within ten years of his robbery conviction. Accordingly, the sentencing judge had the discretion to impose an extended term.

A review of the record also establishes that the sentencing judge assessed the aggravating and mitigating factors and made findings, which are supported by the record. In that regard, the sentencing judge found aggravating factors three, six, and nine. See N.J.S.A. 2C:44-1(a)(3), (6), and (9). The sentencing judge found only the non-statutory mitigating factor that defendant was a youthful offender. The judge went on to state the reasons for finding these factors and the weight that he attached to each factor. Those findings are all supported by the evidence in the record. The sentencing judge then followed the sentencing guidelines, and the sentence imposed does not shock the judicial

conscience.  Accordingly, there is no basis to find that defendant's sentence was excessive.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0552-17T4