NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-1753-18T1
                    A-1985-18T1

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

ANDREW F. STOVEKEN,

      Defendant-Appellant.

_____

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

GEORGE BEECHER,

      Defendant-Appellant.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| **JUNE 12, 2020** |
| **APPELLATE DIVISION** |

      Argued telephonically April 21, 2020 –
      Decided June 12, 2020

      Before Judges Fisher, Accurso and Gilson.

      On appeal from the Superior Court of New Jersey, Law
      Division, Middlesex County, Indictment Nos. 16-08-
      0130 and 16-08-0129.

Steven D. Altman argued the cause for appellant Stoveken (Benedict & Altman, attorneys; Steven D. Altman and Philip Nettl, on the brief).

David J. Altieri argued the cause for appellant Beecher (Galantucci & Patuto, attorneys; David J. Altieri, on the brief).

Steven A. Yomtov, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Steven A. Yomtov, of counsel and on the briefs).

The opinion of the court was delivered by

GILSON, J.A.D.

In these appeals, we address a question of first impression: is a grand jury subpoena sufficient to access prescription drug information maintained in New Jersey's Prescription Monitoring Program (PMP). We hold that a properly issued grand jury subpoena is sufficient to obtain information concerning an investigation into a prescriber. We also hold that the grand jury subpoenas issued in these matters were valid.

Defendants George Beecher and Andrew Stoveken were involved, along with others, in a conspiracy to distribute oxycodone, an opioid pain medication that is classified as a controlled dangerous substance (CDS). During an investigation of the conspiracy, the State issued subpoenas to the administrator of the PMP. Defendants moved to suppress the evidence obtained as a result of

2

those subpoenas, but the trial court denied that motion. Thereafter, both defendants pled guilty to second-degree conspiracy to distribute oxycodone, N.J.S.A. 2C:5-2, N.J.S.A. 2C:35-5(a)(1), and N.J.S.A. 2C:35-5(b)(4); and second-degree distribution of oxycodone, N.J.S.A. 2C:35-5(a)(1), N.J.S.A. 2C:35-5(b)(4), and N.J.S.A. 2C:2-6. Beecher was sentenced to ten years in prison and Stoveken was sentenced to seven years in prison.

In separate appeals, defendants challenge the validity of the subpoenas. They argue that the subpoenas were not actually issued by a grand jury; rather, they were issued by prosecutors and detectives in the Attorney General's Office. They also argue that even if the subpoenas were issued by a grand jury, New Jersey's Constitution requires that a court must find probable cause before information maintained in the PMP can be accessed. We consolidate the appeals for purposes of this opinion, reject both these arguments, and affirm.

Defendant Stoveken also argues that his application to the special probation Drug Court program was improperly denied. We reject that argument and affirm Stoveken's sentence.

I.

We derive the facts from the record on the motion to suppress and admissions defendants made when they pled guilty. In May 2015, a confidential source informed the State about a pharmaceutical narcotics distribution network operating in the South Plainfield area. The source told the State that Beecher, who was a medical doctor, was providing John Burnham with prescriptions for oxycodone. The Division of Criminal Justice launched an investigation into the network. Ultimately, the State came to believe that Beecher, Stoveken, and Burnham were part of a network that included approximately twenty-five individuals.

Beecher was a medical doctor specializing in otolaryngology. Stoveken was an audiologist who shared offices with Beecher. Beecher would write prescriptions for oxycodone for individuals whom he never met based on driver's license information given to him by Stoveken. Beecher would then give the prescriptions to Stoveken, who in turn would give them to Burnham. Burnham oversaw a network of individuals who filled the prescriptions and sold the oxycodone.

Beecher was paid for each prescription he wrote. When he pled guilty, Beecher admitted that he fraudulently prescribed approximately 38,000 doses of

oxycodone during the conspiracy. In connection with his plea to a second-degree crime, Beecher also admitted that the aggregate amount of oxycodone he prescribed exceeded one ounce.

When Stoveken pled guilty, he acknowledged that he acted as the middleman between Burnham and Beecher with the understanding that Burnham would oversee the fulfillment of the oxycodone prescriptions and the sale of the drugs. Stoveken was paid between $250 and $500 per month for his role and he also relayed money from Burnham to Beecher.

As part of its investigation, the State sought records from the PMP. The PMP was established by statute in 2007 as an electronic database "for monitoring controlled dangerous substances that are dispensed in or into [New Jersey] by a pharmacist in an outpatient setting." N.J.S.A. 45:1-45(a). Pharmacies are required to submit, "by electronic means," information about each prescription for CDS, which includes, among other things: the name and address of the patient receiving the medication; the prescriber; the date the prescription was issued; the name, strength, and quantity of the CDS dispensed; and the source of payment for the CDS. N.J.S.A. 45:1-45(b). The PMP is maintained by the Division of Consumer Affairs (DCA), which is part of the Department of Law and Public Safety. N.J.S.A. 45:1-45(a).

Between May 2015 and March 2016, the State issued sixteen subpoenas to the administrator of the PMP. The initial subpoenas sought information about prescriptions written by Beecher. The additional subpoenas sought information concerning prescriptions written by Beecher, as well as prescriptions for various individual patients. Each subpoena stated that the information was to be provided to a State grand jury on an identified date. Each subpoena was also accompanied by a certification from a detective of the Division of Criminal Justice and a cover letter. The certifications stated that the information was sought "pursuant to a subpoena properly issued under the authority of a properly convened grand jury." The cover letters stated that the information should be emailed to the detectives.

The State acknowledges that a grand jury was not necessarily sitting on the dates the subpoenas were issued. It is undisputed, however, that when the information from the PMP was due to be returned, a grand jury was in session.

In response to the subpoenas, the acting administrator of the PMP delivered to the detectives the requested records, together with a certification from the custodian of the records. The State then used the PMP records to develop its investigation. In that regard, the State used information from the

PMP records to obtain communication data warrants and search warrants. The State also interviewed witnesses using the PMP information.

In August 2016, the information the State obtained during its investigation was presented to a grand jury. The grand jury then returned two indictments: one against Beecher, and another against Stoveken, Burnham, and five other alleged co-conspirators. Ultimately, Burnham and the five other co-defendants pled guilty. As part of his plea agreement, Burnham agreed to cooperate with the State and testify against Beecher and Stoveken.

Beecher was charged with four crimes: second-degree conspiracy to distribute oxycodone; second-degree distribution of oxycodone; third-degree distribution of alprazolam (Xanax), N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(13); and first-degree strict liability for the drug-induced death of Jason Stoveken, N.J.S.A. 2C:35-9(a). Jason was the son of defendant Stoveken, who was charged with two crimes: second-degree conspiracy to distribute oxycodone, and second-degree distribution of oxycodone.

Stoveken, joined by Beecher, moved to suppress the evidence obtained from the PMP, as well as evidence the State obtained by using the PMP information. The trial court heard oral arguments on May 12, 2017, and on May 22, 2017, it issued a written opinion and order denying the motion.

The trial court focused its decision on two arguments made by defendants: (1) whether the PMP records should be accessible only on a showing of probable cause; and (2) whether the subpoenas issued by the State were proper grand jury subpoenas. In addressing the first issue, the trial court reasoned that the PMP statute allowed law enforcement personnel to access PMP records pursuant to a grand jury subpoena. N.J.S.A. 45:1-46(i)(8). The trial court also held that such grand jury subpoenas need not be based on a showing of probable cause and instead could be based on a showing of relevancy. In connection with those rulings, the trial court also found that defendants had presented no evidence that the State had abused its access to the PMP records.

Concerning the subpoenas themselves, the trial court held that the subpoenas were validly issued. Relying on our decision in State v. Hilltop Private Nursing Home, Inc., the trial court found that the subpoenas were valid because they were made returnable to the grand jury on specific days when the grand jury was sitting. 177 N.J. Super. 377 (App. Div. 1981). The trial court also found that the administrator of the PMP had the opportunity to appear before the grand jury. Further, the trial court reasoned that the prosecutor or detectives could accept the subpoenaed records for the grand jury. Finally, relying on State v. McAllister, the trial court held that the State was not required

to provide notice to defendants when it served the grand jury subpoenas on the PMP administrator. 184 N.J. 17 (2005).

Following the denial of their motion to suppress, Beecher and Stoveken pled guilty. As noted earlier, both defendants pled guilty to second-degree conspiracy to distribute oxycodone and second-degree distribution of oxycodone. In the plea agreement with Beecher, the State agreed to dismiss all other charges and recommend that Beecher be sentenced to ten years in prison. The charges dismissed against Beecher included the charge of strict liability for the drug-induced death of Jason Stoveken. In pleading guilty, Beecher acknowledged that he had fraudulently prescribed oxycodone and alprazolam to Jason Stoveken and that Jason had died of an overdose caused by "acute combined toxicity due to oxycodone and alprazolam."

In the plea agreement with Stoveken, the State recommended that he be sentenced to seven years in prison. Stoveken applied for admission into Drug Court, contending that he was an alcoholic. Although Stoveken was found to be eligible due to his severe alcoholism, the trial judge determined that Stoveken did not commit the offenses while under the influence of alcohol and that he was therefore not eligible for admission to the Drug Court program.

A-1753-18T1

In accordance with their plea agreements, Stoveken was sentenced to seven years in prison and Beecher was sentenced to ten years in prison. The trial court granted both defendants' applications to stay their sentences pending their appeals and granted defendants bail pending appeal.

II.

On appeal, defendants present two arguments concerning the subpoenas and the denial of the motion to suppress. First, they argue that the subpoenas were improper "office subpoenas" because the grand jury was not convened when the subpoenas were issued, and the materials were produced to detectives rather than the grand jury. Second, they argue that New Jersey's Constitution requires a court order based on a showing of probable cause to access PMP information.

Beecher articulates his arguments as follows:

> THE TRIAL COURT ERRED IN DENYING [BEECHER'S] MOTION TO SUPPRESS BECAUSE THE STATE UNLAWFULLY UTILIZED "OFFICE SUBPOENAS" TO OBTAIN PMP RECORDS CONTRARY TO RELEVANT CASE LAW, THE REQUIREMENTS OF N.J.S.A. 45:1-45 ET SEQ., AND THE NEW JERSEY CONSTITUTION.

Stoveken articulates his arguments as follows:

I. The trial court erred in denying [Stoveken's] Motion to Suppress the subpoenas served upon the Prescription Monitoring Program ("PMP")

    A. A court order, as contemplated by the PMP statute, is constitutionally necessary to protect reasonable expectations of privacy.

    B. Even if a grand jury subpoena is constitutionally sufficient, the PMP statute requires a [c]ourt [o]rder under the present circumstances, because the PMP records were provided to a law enforcement officer, not a grand jury.

In addition, Stoveken contends that the trial court erred in denying his application to enter the Drug Court program and he makes the following arguments:

II. The trial court erred in denying Defendant's entry into the Drug Court program.

    A. Defendant's voluntary Drug Court application was wrongly rejected.

    B. The sentencing court erred by not reconsidering Defendant's Drug Court eligibility under the mandatory track.

We hold that the subpoenas were valid grand jury subpoenas. We also hold that law enforcement personnel can obtain information from the PMP with a valid grand jury subpoena issued on a showing of relevancy. Finally, we

11

affirm the denial of Stoveken's application to the special probation Drug Court program.

A.     The Subpoenas to the PMP

The PMP statute states: "[P]rescription monitoring information submitted to the [DCA] shall be confidential and not be subject to public disclosure." N.J.S.A. 45:1-46(b).  Accordingly, access to information in the PMP is limited. The DCA itself must review the information to (1) protect against "misuse, abuse, or diversion of a [CDS]" and (2) identify any violation of law or regulations.  N.J.S.A. 45:1-46(c)(1) to (2).  The PMP statute also permits access to prescribers, pharmacies, and appropriate medical and dental personnel generally related to treatment of patients.  N.J.S.A. 45:1-46(h).  In addition, the statute authorizes access to certain persons, including both "a State, federal, or municipal law enforcement officer who is acting pursuant to a court order and certifies that the officer is engaged in a bona fide specific investigation of a designated practitioner, pharmacist, or patient" and "a properly convened grand jury pursuant to a subpoena properly issued for the records."  N.J.S.A. 45:1-46(i)(6), (8).  As a condition for obtaining prescription monitoring information, such persons must "certify the reasons for seeking to obtain that information." N.J.S.A. 45:1-46(j).

The State acknowledges that it relied on the grand jury subpoena provision of the PMP statute to access the information concerning Beecher and relatedly Stoveken. N.J.S.A. 45:1-46(i)(8). In other words, the State did not obtain a court order and is not relying on that provision of the statute. N.J.S.A. 45:1-46(i)(6).

The first question, therefore, is whether the subpoenas issued were valid grand jury subpoenas. The trial court did not conduct an evidentiary hearing. Instead, the facts relevant to the issuance of the subpoenas were presented as undisputed. We review a trial court's conclusions of law in a non-evidentiary hearing de novo. State v. Hinton, 216 N.J. 211, 228 (2013); State v. Jackson, 460 N.J. Super. 258, 271 (App. Div. 2019). Moreover, when applying law to undisputed facts, our review is plenary. Spangenberg v. Kolakowski, 442 N.J. Super. 529, 535 (App. Div. 2015) (quoting Reese v. Weis, 430 N.J. Super. 552, 568 (App. Div. 2013)).

1.     The Validity of the Subpoenas

"New Jersey courts have consistently affirmed the expansive investigative powers of grand juries." McAllister, 184 N.J. at 34. A grand jury subpoena is valid if the State establishes "(1) the existence of a grand jury investigation and (2) the nature and subject matter of the investigation." Ibid. (quoting, as the

"prevailing standard," In re Grand Jury Subpoena Duces Tecum, 167 N.J. Super. 471, 472 (App. Div. 1979)).  A grand jury does not have to initiate the subpoena process or authorize the issuance of the subpoena.  Id. at 34-35 (citing Hilltop, 177 N.J. Super. at 389).  Accordingly, a prosecutor can issue subpoenas in the name of the grand jury, which does not have to be sitting on the day the subpoenas are issued.  Jackson, 460 N.J. Super. at 270.

In summary, there are three criteria required for a valid grand jury subpoena:  (1) the existence of a grand jury investigation; (2) the identification of the nature and subject matter of the investigation; and (3) the subpoenaed materials must be returnable on a day when a grand jury is sitting and the subpoenaed individual must have an opportunity to appear before the grand jury. Ibid.; McAllister, 184 N.J. at 34-35.

It is also well-established that a grand jury subpoena can be issued on a showing of relevancy for the information, and probable cause need not be established.  McAllister, 184 N.J. at 34-35.  Moreover, the State can establish relevancy on a prosecutor's representations and such representations do not have to be set forth in a certification or affidavit.  Id. at 34 (citing In re Grand Jury Subpoena Duces Tecum, 167 N.J. Super. at 472).

When the Legislature enacted the PMP statute in 2007, the law concerning the validity of grand jury subpoenas was well-established. We presume that the Legislature was aware of that jurisprudence and, therefore, we construe N.J.S.A. 45:1-46(i)(8) accordingly. See Atl. Ambulance Corp. v. Cullum, 451 N.J. Super. 247, 255 (App. Div. 2017) (quoting Macedo v. Dello Russo, 178 N.J. 340, 345-46 (2004)) (holding that the Legislature is "presumed to be aware" of judicial case law and the judiciary's interpretations of its enactments).

All sixteen of the subpoenas issued by the State met these criteria and were valid grand jury subpoenas. Each subpoena was issued in the name of a grand jury, and the subpoenas, together with the accompanying certifications, established the existence of a grand jury investigation. Each subpoena also established the nature and subject matter of the investigation by identifying Beecher and individuals to whom he was prescribing medication. Finally, each subpoena identified a specific date, time, and location "to give evidence before the State grand jury" and the PMP administrator had the opportunity to appear before the State grand jury. That the evidence was turned over to detectives, as opposed to the grand jury itself, does not invalidate the subpoenas. It is also undisputed that the materials collected from the PMP were ultimately presented to a grand jury.

2.    The Constitutionality of the Grand Jury Subpoenas

Defendants argue that even if the grand jury subpoenas were valid, New Jersey's Constitution requires that the PMP information can be accessed only on a showing of probable cause. Defendants also contend that probable cause must be found by a court. We disagree.

The Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution are almost identical and guarantee the right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures by the government. U.S. Const. Amend. IV; N.J. Const. art. I, ¶ 7. The Fourth Amendment of the federal Constitution generally does not protect information that has been turned over to a third party. See United States v. Miller, 425 U.S. 435, 442 (1976). In contrast, New Jersey gives greater protection to its residents under its Constitution. Individuals in New Jersey do not lose their right to privacy simply because they have given information to a third party. See State v. Earls, 214 N.J. 564, 568 (2013); McAllister, 184 N.J. at 25-27; see also State v. Shaw, 237 N.J. 588, 616 (2019) (citing State v. Alston, 88 N.J. 211, 226 (1981)) ("The New Jersey Constitution provides greater protections from warrantless searches and seizures than the Fourth Amendment of the Constitution of the United States.").

Nevertheless, even when New Jersey recognizes that its citizens have a reasonable expectation of privacy in information, the standard for accessing that information varies in light of the intrusion on the privacy interests. See Earls, 214 N.J. at 569; McAllister, 184 N.J. at 33; see also State v. Lunsford, 226 N.J. 129, 131-32 (2016). In other words, although a citizen may have a reasonable expectation of privacy, under certain circumstances the State can intrude on that privacy in order, among other things, to investigate criminal activity.

Accordingly, the question becomes whether the intrusion should require a showing of probable cause or relevancy. McAllister, 184 N.J. at 33; see also Lunsford, 226 N.J. at 131. For example, in Lunsford, the Court decided that an individual's privacy interest in telephone billing records was protected by a relevancy standard. Lunsford, 226 N.J. at 154; see also State v. Reid, 194 N.J. 386, 389 (2008) (holding that a privacy interest in information provided to internet service providers was adequately protected by grand jury procedures); McAllister, 184 N.J. at 19 (same as to bank records). By contrast, in Earls, the Court determined that to access cell-phone location information, a warrant based on probable cause was required. 214 N.J. at 569.

In applying these constitutional standards to the PMP statute, we hold that the relevancy standard applies when the government is seeking information

17

about a prescriber. Beecher was a prescribing doctor. Stoveken was neither the prescriber nor the patient receiving the medicine. Consequently, neither defendant had a strong privacy interest in the patient information and their reasonable expectations of privacy concerning the information in the PMP was limited. See Lunsford, 226 N.J. at 131; McAllister, 184 N.J. at 33; see also State v. Evers, 175 N.J. 355, 368-69 (2003) (citing Smith v. Maryland, 442 U.S. 735, 740 (1979)) (recognizing that "[t]o invoke the protections of the Fourth Amendment and its New Jersey counterpart, Article I, Paragraph 7, [a] defendant must show that a reasonable or legitimate expectation of privacy was trammeled by government authorities.").

We do not reach the issue of what the appropriate standard is if the State seeks information in an investigation of a patient. We also do not determine whether a court order under N.J.S.A. 45:1-46(i)(6) could be issued on a showing of relevancy versus probable cause. As noted earlier, the State is not relying on that provision and, therefore, those issues are not before us. To the extent that the trial court reached those issues, we construe the court's reasoning to be dicta and we take no position on whether it was correct.

In summary, the subpoenas the State issued to the administrator of the PMP were valid grand jury subpoenas and those subpoenas did not violate either

A-1753-18T1

Beecher's or Stoveken's reasonable expectation of privacy under our State or federal Constitutions.

B.    Stoveken's Application to Drug Court

"Drug Courts are specialized courts within the Superior Court that target drug-involved [or alcohol-involved] 'offenders who are most likely to benefit from treatment and do not pose a risk to public safety.'" State v. Meyer, 192 N.J. 421, 428-29 (2007) (citing Admin. Office of the Courts Manual for Operation of Adult Drug Courts in New Jersey (Drug Court Manual) at 3 (July 2002), https://dspace.njstatelib.org/xmlui/handle/10929/46207).  There are two tracks for admission to Drug Court.  State v. Clarke, 203 N.J. 166, 174-75 (2010) (citing Drug Court Manual at 10).  Offenders must either satisfy the requirements for "special probation" pursuant to N.J.S.A. 2C:35-14 (track one) or "otherwise be eligible under other sections of the code of criminal justice" (track two).  Drug Court Manual at 10; accord State v. Maurer, 438 N.J. Super. 402, 412-13 (App. Div. 2014) (quoting Clarke, 203 N.J. at 174-76).  In addition, N.J.S.A. 2C:35-14.2 provides for mandatory consideration of certain offenders who meet the requirements set forth in N.J.S.A. 2C:35-14 for special probation.  Both tracks require a person to meet the nine eligibility criteria set forth in N.J.S.A. 2C:35-14.  N.J.S.A. 2C:35-14 requires, among other things, that the

applicant not be a danger to the community and that the applicant was under the influence of CDS or alcohol when the crime was committed or the crime was committed to acquire property or monies to support the person's drug or alcohol dependency. N.J.S.A. 2C:35-14(a).

Before pleading guilty, Stoveken applied to be admitted to the Drug Court program, contending that he was a chronic alcoholic. A treatment assessment service for the courts (TASC) evaluator found Stoveken clinically eligible due to his severe alcoholism. The prosecutor, however, opposed Stoveken's application, contending that he was a danger to the community. The reviewing Drug Court judge found that Stoveken was not eligible because he did not commit the crimes while under the influence of alcohol and he did not commit the crimes to acquire property to support his alcohol dependency. N.J.S.A. 2C:35-14(a)(3).

Thereafter, Stoveken was screened and found eligible for mandatory Drug Court consideration. Before he was sentenced, Stoveken submitted a new psychiatric evaluation. According to the psychiatrist who evaluated Stoveken, Stoveken's major problem was alcohol addiction. In particular, the psychiatrist opined that the death of Stoveken's son had a major impact on Stoveken and caused him to become severely depressed. The sentencing judge considered

Stoveken's contentions but determined that they did not establish a causal connection to his criminal behavior and therefore there were no new facts to change the analysis that had been conducted by the Drug Court judge.

We review a determination regarding eligibility for admission into Drug Court for an abuse of discretion. See Maurer, 438 N.J. Super. at 418. In evaluating Stoveken's application, the judges reviewed and considered the TASC evaluation report, Stoveken's criminal history, and the positions of the prosecutor and defense counsel. Based on those materials, the judges concluded that Stoveken failed to establish the third criteria for admission to Drug Court, N.J.S.A. 2C:35-14(a)(3). Specifically, the judges found Stoveken did not commit the offense while under the influence of alcohol or to obtain money to support his alcohol addiction. The judges' conclusions were consistent with the applicable law and supported by the evidence in the record. Moreover, when Stoveken renewed his application, contending he was eligible under the mandatory track, the sentencing judge again concluded that there were no facts establishing that Stoveken satisfied the third criteria.

On appeal, Stoveken argues that the sentencing judge did not give adequate consideration to his arguments. Having reviewed the record, we reject that argument. While the sentencing judge did not dwell on the issue, he duly

considered Stoveken's renewed application and rejected his admission into Drug Court.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION